**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IRVING LEVINE AUTOMOTIVE DISTRIBUTORS, INC., individually and on behalf of a class of all others similarly situated, | |
| Plaintiff, | Case No. 17-cv-13147 |
| v. | |
| CALSONIC KANSEI CORPORATION; CALSONIC KANSEI NORTH AMERICA, INC.; T.RAD CO., LTD.; T.RAD NORTH AMERICA, INC.; MITSUBA CORPORATION; and AMERICAN MITSUBA CORPORATION, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Irving Levine Automotive Distributors, Inc., individually and on behalf of the proposed class of direct purchasers of Radiators (as defined below), brings this action against Defendants under the federal antitrust laws for treble damages and alleges as follows.

**NATURE OF THE CASE**

1.    Beginning at least as early as January 1, 1998, and continuing through the date of the filing of the Complaint, the Defendants and their co-conspirators—United States and global manufacturers and suppliers of Radiators—violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Radiators sold in the United States and elsewhere at supra-competitive levels. As a result of this unlawful conduct, Plaintiff paid artificially inflated prices for Radiators and has suffered antitrust injury to its

business or property. Plaintiff further alleges that Defendants fraudulently concealed their conspiracy.

2.     Defendants T.RAD Co., Ltd. and Mitsuba Corporation have pleaded guilty to federal charges and agreed to pay multi-million-dollar criminal fines for their roles in a conspiracy to fix prices of Radiators installed in vehicles manufactured and sold in the United States and elsewhere.

3.     On September 26, 2013, the United States Department of Justice ("DOJ") announced that T.RAD Co., Ltd. agreed to plead guilty and pay a $13.75 million criminal fine for its role in a conspiracy to fix prices of certain automotive parts, including Radiators, installed in vehicles that were manufactured and sold in the United States and elsewhere.

4.     On September 26, 2013, the DOJ announced that Mitsuba Corporation agreed to plead guilty and pay a $135 million criminal fine for its role in a conspiracy to fix prices of certain automotive parts installed in vehicles manufactured and sold in the United States and elsewhere.

5.     On November 6, 2013, Mitsuba Corporation's guilty plea was filed. The plea agreement specifies that radiator fans were one of the automotive parts for which Mitsuba Corporation conspired to fix prices.

6.     On December 1, 2014, the DOJ announced that Kosei Tamura, an executive of T.RAD Co., Ltd., agreed to plead guilty and to serve one year and one day in a United States prison and pay a $20,000 criminal fine for his role in a conspiracy to fix prices of Radiators installed in vehicles manufactured and sold in the United States and elsewhere.

7.     Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, and asserts the following allegations on

information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigations made by its attorneys.

## DEFINITIONS

8. The term "Class Period" refers to a time period beginning at least as early as January 1, 1998 and continues through the date of the filing of the Complaint.

9. The term "OEM" refers to original equipment manufacturers. OEMs include, but are not limited to, manufacturers of vehicles including automobiles, trucks, buses, recreational vehicles, and motorized vehicles.

10. The term "Radiators" refers to devices that help to prevent automotive vehicles from overheating. Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the vehicle moves. Radiators are replaced when a vehicle consistently overheats. The term "Radiators" includes, without limitation, radiator fans.

11. The term "Defendant" or "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including Radiator manufacturers merged with or acquired by the named Defendants, and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Radiators directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

12. References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## JURISDICTION AND VENUE

13.   Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

14.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

15.   Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

16.   The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

17.   This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Radiators throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

18. By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court. Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## THE PARTIES

*Plaintiff*

19. Plaintiff Irving Levine Automotive Distributors, Inc. is a Connecticut corporation with its principal place of business in Danbury, Connecticut. Plaintiff purchased Radiators directly from one or more of the Defendants or their co-conspirators during the Class Period and suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

*The Calsonic Kansei Defendants*

20. Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan. Calsonic Kansei Corporation − directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period.

21. Defendant CalsonicKansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee. It is a subsidiary of and wholly owned and/or controlled by its parent, Calsonic Kansei Corporation. CalsonicKansei North America, Inc. − directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

5

22. Defendants Calsonic Kansei Corporation and CalsonicKansei North America, Inc. are referred to collectively herein as "Calsonic Kansei."

*The T.RAD Defendants*

23. Defendant T.RAD Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. T.RAD Co., Ltd. – directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period.

24. Defendant T.RAD North America, Inc. is a Delaware corporation with its principal place of business in Hopkinsville, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, T.RAD Co., Ltd. T.RAD North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

25. Defendants T.RAD Co., Ltd. and T.RAD North America, Inc. are referred to collectively herein as "T.RAD."

*The Mitsuba Defendants*

26. Defendant Mitsuba Corporation is a Japanese company with its principal place of business in Gunma, Japan. Mitsuba Corporation – directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period.

6

27. Defendant Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed, and/or sold Radiators that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

28. Defendants Mitsuba Corporation and American Mitsuba Corporation are referred to collectively herein as "Mitsuba."

### DEFENDANTS' CO-CONSPIRATORS AND AGENTS

29. The acts alleged in this Complaint to have been done by Defendants CalsonicKansei North America, Inc., T.RAD North America, Inc. and American Mitsuba Corporation were authorized, ordered, and condoned by their respective parent companies.

30. The acts alleged to have been done by the Defendants and their co-conspirators were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

31. Other persons and entities not named as Defendants, including, but not limited to, Denso Corporation, and Denso International America, Inc., have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as Defendants in this Complaint.

32.  Each Defendant acted as a principal or an agent of or for the other Defendants and their co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

33.  The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce. During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of Radiators in a continuous and uninterrupted flow of interstate and foreign commerce.

## RADIATORS

34.  Radiators manufactured, distributed or sold by Defendants and their co-conspirators during the Class Period are not functionally distinguishable from each other in any material respect.

35.  The United States Radiator industry was a $3.35 billion dollar a year industry in 2011.

36.  Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the vehicle moves. Radiators are replaced when a vehicle consistently overheats. Radiators include, without limitation, radiator fans. *See* Figure 1.



Figure 1.

37. Radiators are installed by OEMs in new vehicles as part of the manufacturing process. They are also installed in vehicles to replace worn out, defective, or damaged Radiators.

38. OEMs include the "Big Three" in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the United States. For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia. In addition to OEMs, numerous other direct purchasers, including Plaintiff and others, purchased Radiators directly from Defendants or entities of which one of the Defendants is the ultimate parent.

39. When purchasing Radiators, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers. For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform. In response, motor vehicle parts

REDACTED

suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years. Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and in the United States.

40.   Defendants and their co-conspirators supplied Radiators to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Radiators (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) outside the United States for installation in motor vehicles manufactured outside the United States for export to and sale in the United States.

41.   During the Class Period, Defendants, entities of which one of the Defendants is the ultimate parent, and their co-conspirators, sold Radiators directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

42.   During the Class Period, Defendants and their co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Radiators. As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

REDACTED

## THE CHARACTERISTICS OF THE MARKET FOR RADIATORS ARE CONDUCIVE TO COLLUSION

43.   Several important economic characteristics of the market for Radiators render it plausible that there was collusion among Radiator suppliers.

*Market Concentration*

44.   The market for Radiators is highly concentrated.

*High Barriers to Entry*

45.   A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. New entrants would, in turn, decrease the market power of the co-conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Therefore, high barriers to entry help facilitate a cartel.

46.   There are high barriers to entry in the market for Radiators. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor. A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

*Price Inelasticity*

47.   When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic. In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic. Otherwise, increased prices would result in declining sales, revenues, and profits.

11

48.   All water cooled vehicles must use Radiators because there are no viable substitute products. Therefore, pricing for Radiators is highly inelastic.

*Opportunities for Collusion*

49.   Defendants attended industry events that created opportunities to conspire. Such industry events have provided myriad opportunities to meet, conspire, and share information.

## DEFENDANTS' ANTITRUST CONSPIRACY

50.   During the Class Period, Defendants and their co-conspirators, conspired to rig bids for, to allocate the supply of, and to raise, fix, and maintain prices for Radiators sold in or into the United States.

51.   Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

52.   Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss bids and price quotations for Radiators sold in or into the United States.

53.   Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate among themselves the supply of Radiators sold in or into the United States.

54.   Defendants, their subsidiaries, affiliates and entities of which the Defendants are the ultimate parent, sold Radiators to customers in the United States and elsewhere at collusive and non-competitive prices.

55.   Defendants and their co-conspirators accepted payments for Radiators sold in the United States and elsewhere at collusive and non-competitive prices.

56. Defendants and their co-conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

57. Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to OEMs in the United States and elsewhere in accordance with their conspiratorial agreements.

58. Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

59. Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

60. Defendants and their co-conspirators accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

61. The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers; (b) the suppliers submit bids; (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (d) the suppliers submit revised bids; and (e) the OEM selects the winner.

62. Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

63. When OEMs purchase Radiators directly from the supplier to whom they awarded the contract, the OEM purchases the Radiators at the winning price.

64. That winning price is also used when suppliers that were not part of the RFQ process purchase Radiators directly from the winning bidder for incorporation into products manufactured and sold to OEMs. Those suppliers and other direct purchasers who directly

purchase Radiators from the winning bidder, its subsidiaries, affiliates or entities of which the winning bidder is the ultimate parent, pay at least the winning price. The OEM price sets the floor for pricing of Radiators to direct purchasers from Defendants, their subsidiaries, affiliates or entities of which the Defendants are the ultimate parent.

65.   Defendants' conduct persisted for many years. Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

66.   Among other conduct, Defendants manipulated the RFQ process to accomplish their conspiracy.

67.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

68.   Defendants and their co-conspirators coordinated their Radiator pricing. They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other. They exchanged pricing information not just to ensure that the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

69.   Defendants and their co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. These activities included, but were not limited to, the following:

a.      agreeing to unlawfully coordinate pricing for, and allocate sales of, Radiators. ████████████████████████████████████████████████████

14

████████████████████████████████████████████

████████████████████████

    b.      colluding with regard to RFQs for Radiator business by agreeing on pricing and then communicating agreed-upon prices to Defendants' subsidiaries in the United States, where the prices were submitted collusively; and

    c.      discussing and exchanging pricing information with regard to Radiator RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Radiator pricing before submission to OEMs in the United States and elsewhere.

70.  Defendants and their co-conspirators knew and intended that their actions regarding their sales of Radiators to motor vehicle manufacturers would have a direct impact on prices for Radiators sold to all direct purchasers in the United States.

71.  Defendants' single price-fixing conspiracy involving Radiators impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Radiators from Defendants, their subsidiaries, affiliates or entities of which the Defendants are the ultimate parent.

REDACTED

**Collusion In The Automotive Parts Industries**

72.  In a January 30, 2012 DOJ press release the Acting Assistant Attorney General of the DOJ's Antitrust Division, Sharis A. Pozen, stated that the auto parts antitrust investigation is "the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct."

73.  FBI Special Agent in Charge Andrew G. Arena also said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and had been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

**Defendants' Price Fixing Conspiracy: Government Investigations and Guilty Pleas**

74.  During the Class Period, Defendants and their co-conspirators conspired to rig bids for and allocate the supply of Radiators and raise, fix, and maintain prices for Radiators sold in the United States. Regulatory authorities in the United States and Japan have investigated, fined, and/or charged Defendants due to this conspiracy.

75.  On September 26, 2013, the DOJ charged Defendant T.RAD Co., Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices" of certain automotive parts, including Radiators, in violation of the Sherman Act.

76.  Also on September 26, 2013, the DOJ announced that Defendant T.RAD Co., Ltd. agreed to pay a $13.75 million criminal fine and plead guilty to a one-count criminal information charging T.RAD Co., Ltd. with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts, including Radiators, sold to automobile

manufacturers, including Toyota and Honda, in the United States and elsewhere from November 2002 until February 2012. On November 12, 2013, T.RAD Co., Ltd.'s guilty plea was filed.

77.   T.RAD and its co-conspirators (a) had meetings and communications to discuss bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere, (b) agreed on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere, (c) agreed to allocate the supply of Radiators sold in the United States and elsewhere on a model-by-model basis, (d) submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached, (e) sold radiators to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices, (f) participated in meetings and engaged in communications relating to monitoring the conspiracy and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme, and (g) employed measures to keep their conduct secret including, but not limited to, using code names and destroying documents relating to the conspiracy.

78.   Before Judge Steeh at Defendant T. RAD Co, Ltd.'s sentencing hearing on June 26, 2014, Defendant T. RAD Co., Ltd.'s corporate representative, Mr. Shigeo Hirono, under oath, agreed to tender Defendant T. RAD Co., Ltd.'s plea of guilty to conspiracy to restrain trade in violation of the Sherman Act. Mr. Hirono also affirmed that the statement made by Defendant T. RAD Co., Ltd.'s counsel to the Court at the hearing was accurate to the best of his knowledge, and that statement read:

> T.Rad is an entity organized and existing under the laws of Japan with its principal place of business in Tokyo, Japan. T.Rad North America, Inc. is a U.S. subsidiary of T. Rad. T.Rad manufactures radiators, along with a related product that your Honor referred to, the automatic transmission fluid warmers or ATF warmers for sale in the U.S. and elsewhere. Radiators, of course, are devices located in [sic] engine compartment of a

vehicle that warm the automatic transmission fluid. Within the general auto parts industry, T.Rad is a relatively small company focused principally on the radiator product line. From 2002 through February 2010, T.Rad engaged in [sic] two party conspiracy with one other single competitor that manufactured and sold radiators and ATF warmers. Certain employees of T.Rad had discussions and meetings with this other competitor. During these discussions and meetings, certain employees of T.Rad and this co-conspirator agreed and conspired to rig bids quoted and or fix prices with respect to radiators for Honda and Toyota, and a ATF warmer for Toyota. Radiators sold by both co-conspirators and the ATF warmer sold by the other conspirator, traveled in interstate commerce.

For purposes of the plea agreement, T.Rad had approximately $46 million in sales of radiators to Honda in the United States. T.Rad did not have any sales of radiators to Toyota in the United States, and did not have any sales of ATF warmers to Honda or Toyota in the United States. Radiators that were subject of the conspiracy were sold by T.Rad's U.S. subsidiary, and in fact, some activities in furtherance of the conspiracy during the last five years of it were carried out here in the Eastern District of Michigan.

Finally, as Mr. Hirono will affirm, the company is extremely and very remorseful for its action. They've undertaken steps to ensure that this conduct will not be repeated, including updating its antitrust compliance program, and providing training to relevant employees. The company accepts full responsibility for its conduct, and respectfully requests the Court to accept the sentence and fine that's recommended by the government.

79. On December 1, 2014, the DOJ announced that Kosei Tamura, an executive of T.RAD Co., Ltd., had agreed to plead guilty and to serve one year and one day in a United States prison and pay a $20,000 criminal fine for his role in a conspiracy to fix prices of Radiators during the period beginning as early as November 2002 until at least February 2010.

80. According to the Information filed, Defendant Kosei Tamura and his co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of radiators sold to Honda Motor Company Ltd. and certain of its subsidiaries in the United States and elsewhere.

81.   Additionally, Defendant Kosei Tamura and his co-conspirators (a) had meetings and communications to discuss bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere, (b) agreed on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere, (c) agreed to allocate the supply of Radiators sold in the United States and elsewhere on a model-by-model basis, (d) submitted bids and price quotations to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached, (e) sold radiators to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices, (f) participated in meetings and engaged in communications relating to monitoring the conspiracy and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme, and (g) employed measures to keep their conduct secret including, but not limited to, using code names.

82.   On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to pay a $135 million fine and plead guilty to a two-count criminal information charging Defendant Mitsuba Corporation with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere.

83.   According to the DOJ announcement, Mitsuba Corporation also agreed to plead guilty to obstruction of justice, because one of its high-level U.S.-based executives had ordered the destruction of evidence after learning of the DOJ's investigation of collusion in the auto parts industry.

84.   According to the Information filed, defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts conspiracy by: (a) participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and

price quotations to be submitted to automobile manufacturers in the United States and elsewhere. "Automobile manufacturers", for purposes of the Mitsuba Information, was defined to mean Honda Motor Company Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Toyota Motor Corporation, and Chrysler Group, LLC, and certain of their subsidiaries, affiliates, suppliers and others; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts, sold to automobile manufacturers in the United States and elsewhere; (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere; (e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached; (f) selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and (g) accepting payment for certain automotive parts sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices; (h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and (i) employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

85. Defendant Mitsuba Corporation's guilty plea defined "automotive parts" to include, among other parts, "radiator fans." (Plea Agreement, ¶ 14). Pursuant to its guilty plea, Mitsuba Corporation and its subsidiaries pledged to cooperate in the DOJ's automotive parts investigation, including with respect to radiator fans. Mitsuba Corporation's guilty plea further

provided that in exchange for it and its subsidiaries' cooperation in the DOJ's automotive parts investigation (including with respect to radiator fans), the DOJ agreed to refrain from criminally prosecuting Mitsuba Corporation and its subsidiaries for price-fixing certain automotive parts, including radiator fans. With respect to the obstruction of justice count, the criminal information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

> After becoming aware of the FBI search of Defendant's coconspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

> Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

Mitsuba Corporation's guilty plea also charged that:

> Executive B of the defendant, a senior executive of the defendant and a member of the defendant's Board of Directors, and Executive C, a senior executive of the defendant, also became aware of the search and directed certain of their subordinates and other employees that documents and electronic files in the possession, custody and control of the defendant in Japan should be concealed and destroyed. Executive B's and C's

subordinates and other employees took acts to conceal and destroy such evidence, and did conceal and destroy such evidence.

86. Defendant Mitsuba Corporation's plea agreement with the DOJ was filed on November 6, 2013 and states, in part:

> [Mitsuba Corporation] will waive indictment and plead guilty to a two-count Information to be filed in the United States District Court for the Eastern District of Michigan. Count I of the Information will charge [Mitsuba Corporation] with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Count II of the Information will charge [Mitsuba Corporation] with altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence the investigation of the conduct charged in Count I, and in relation to and contemplation of such investigation, in violation of 18 U.S.C. § 1519.

87. Defendant Mitsuba Corporation's plea agreement specifies radiator fans as one type of automotive part in which Mitsuba engaged in a conspiracy to, *inter alia,* fix prices and rig bids.

88. Defendant Mitsuba Corporation also agreed to plead guilty to one count of obstruction of justice for its efforts to destroy evidence after learning of the DOJ's investigation into collusion in the auto parts industry.

89. On December 1, 2014, the DOJ announced that Kazumi Umahashi, a former executive of Mitsuba Corporation, had agreed to plead guilty and to serve thirteen months in a United States prison and pay a $20,000 criminal fine for his role in a conspiracy to fix prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere during the period beginning on or about June 2005 until on or about December 2009.

90. On February 5, 2015, the DOJ announced that a grand jury had returned a two-count indictment against two former executives of Mitsuba Corporation, for conspiring to fix prices and rig bids for certain automotive parts and for obstruction of justice for ordering the destruction of evidence related to the conspiracy.

91. On February 26, 2015, the United States District Court for the Eastern District of Michigan stated: "It is undisputed that Mitsuba Corporation participated in the criminal conspiracy to rig bids, fix prices, and allocate the supply of radiator fans" (Op. and Order Den. Defs. Mitsuba Corp. and American Mitsuba Corp.'s Mot. Dismiss Dealership Pls.' Consolidated Am. Class Action Compl. and End-Payor Pls.' Consolidated Am. Class Action Compl. 5, February 26, 2015, ECF No. 71).

92. On May 14, 2015, a grand jury indicted Michitaka Sakuma, a former Executive Managing Director in charge of sales and member of the board of directors of T.RAD Co., Ltd. for his participation "in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, radiators sold to Honda and Toyota in the United States and elsewhere."

93. In September 2016, it was announced that T.RAD Co., Ltd. and a U.S.-based subsidiary agreed to pay $162,500 to the State of California to settle allegations that they violated the Sherman Act and California antitrust and unfair competition laws by conspiring to rig bids for and to fix and maintain the prices of certain auto parts, including Radiators.

94. On March 8, 2017, the European Commission fined Calsonic Kansei, along with certain other automotive manufacturers, a total of 155 million euros, in part for their admitted participation in cartels in Europe involving air conditioning and engine cooling components,

REDACTED

including Radiators. The fine also covered certain other automotive manufacturers and certain other automotive parts.

95. Defendants T.RAD and Mitsuba carried out their illegal scheme along with defendant Calsonic Kansei and other unnamed co-conspirators.

## CLASS ACTION ALLEGATIONS

96. Plaintiff brings this action on behalf of itself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representative of a Class defined as follows:

> All direct purchasers of Radiators (excluding Defendants and their past and present parents, subsidiaries, affiliates and joint-ventures) in the United States from any of the Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, joint-ventures, or entities of which they are the ultimate parent) during the Class Period.

97. Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. The exact number of Class members is unknown to Plaintiff. The identity of the members of the Class can be readily determined from information and records Defendants possess or control through their subsidiaries, affiliates or joint ventures.

98. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Radiators as a result of Defendants' anticompetitive and unlawful conduct.

99. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

100. Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

REDACTED

101. Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

102. There are core questions of law and fact common to the Class, such as:

      a.     whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Radiators;

      b.     who participated in the conspiracy and how long it lasted;

      c.     whether the conspiracy caused Radiator prices to be higher than they otherwise would have been;

      d.     whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

      e.     whether Defendants' conduct violated Section 1 of the Sherman Act;

      f.     whether Defendants undertook actions to conceal their unlawful conspiracy; and

      g.     how to measure the damages suffered by the Class.

103. A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system. A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

104. Defendants' anticompetitive conduct has had the following effects:

a.      price competition has been restrained, suppressed, or eliminated with respect to Radiators;

b.      the prices of Radiators have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers have been deprived of free and open competition in the Radiator market.

105. As a direct result of Defendants' contract, combination, or conspiracy, Plaintiff and other Class members paid higher prices for Radiators than they would have in the absence of the conspiracy, and Plaintiff and other Class members have sustained injury to their business or property.

## PLAINTIFF'S CLAIMS ARE TIMELY

106. Plaintiff and other Class members had no knowledge or notice of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least the time when the DOJ announced that Defendants T.RAD Co., Ltd. and Mitsuba Corporation had agreed to plead guilty on September 26, 2013, at the earliest.

107. Plaintiff and other Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, September 26, 2013.

108. No information about the Radiator conspiracy was in the public domain or otherwise available to Plaintiff or the Class prior to September 26, 2013, when the DOJ announced that Defendants T.RAD Co., Ltd. and Mitsuba Corporation had agreed to plead guilty. Prior to that

time, there was no or insufficient information to suggest that Defendants were involved in a Radiator conspiracy. For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, September 26, 2013.

109. Fraudulent concealment by Defendants and their co-conspirators also tolled the statute of limitations on the claims asserted by Plaintiff and the Class until at least September 26, 2013. Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as January 1, 1998. For example, the September 26, 2013 DOJ press release states that "[Defendants] took measures to keep their conduct secret by using code names and meeting in remote locations." Because of this, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

110. Before at least September 26, 2013, Plaintiff and the Class were unaware of Defendants' and their co-conspirators' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Radiators during the Class Period. No information, actual or constructive, was ever made available to Plaintiff or other members of the Class that would have suggested that they were being injured by Defendants' and their co-conspirators' unlawful conduct.

111. The affirmative acts by the Defendants and their co-conspirators' alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

112. By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. Because Radiators are not exempt from antitrust regulation, Plaintiff and the Class reasonably believed that the market for Radiators was competitive.

113. Defendants and their co-conspirators represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements. In making those false representations, Defendants and their co-conspirators misled Plaintiff and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

114. Defendants' and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

115. In particular, Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

116. During these meetings, conversations, and communications, Defendants and their co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

117. Defendants and their co-conspirators likewise agreed to allocate the supply of Radiators sold to customers in the United States and elsewhere.

118. Defendants and their co-conspirators also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

119. In accordance with their agreements, Defendants and their co-conspirators submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

120. Plaintiff and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy

employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

121. For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until at least September 26, 2013.

## COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

122. Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

123. Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

124. The acts done by each of the Defendants and their co-conspirators as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

125. Commencing at least as early as January 1, 1998, and continuing through the present, the exact dates being currently unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Radiators, creating anticompetitive effects.

126. Defendants' and their co-conspirators' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Radiators throughout the United States.

127. As a result of the conspiracy alleged herein, the prices charged to Plaintiff and the

other members of the Class for Radiators were unlawfully raised, fixed, maintained, or stabilized in the United States.

128. The conspiracy has had the following effects:

    a.    prices paid by Plaintiff and the Class for Radiators were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Radiators; and

    c.    competition in the market for Radiators has been unlawfully restrained, suppressed, or eliminated.

129. As a direct and proximate result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

130. The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and in favor of the Class herein, and respectfully requests the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

REDACTED

      C.      That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

      D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

      E.      That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

      F.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with the law; and

      G.      That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: September 25, 2017

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
**FINK + ASSOCIATES LAW**
38500 Woodward Ave; Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
nfink@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**PRETI, FLAHERTY, BELIVEAU
& PACHIOS LLP**
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone:(215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

32

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whose@kohnswift.com
dabrahams@kohnswift.com

Solomon B. Cera
Thomas B. Bright
**CERA LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
scera@cerallp.com
tbright@cerallp.com

C. Andrew Dirksen
**CERA LLP**
800 Boylston Street, 16th Floor
Boston, MA 02199
Telephone: (857) 453-6555
scera@cerallp.com
cdirksen@cerallp.com

M. John Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
Telephone: (877) 515-7955
jdominguez@cohenmilstein.com

David A. Young
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
dyoung@cohenmilstein.com

Matthew W. Ruan
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
mruan@cohenmilstein.com

Irwin B. Levin
Scott Gilchrist
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Lee Albert
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
lalbert@glancylaw.com
glinkh@glancylaw.com

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307-4444
carlpers2@gmail.com

*Counsel for Plaintiff Irving Levine Automotive*
*Distributors, Inc. and the Proposed Class*